**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) | Chapter 11 |
| EXACTECH, INC., *et al.*,[1] | ) | Case No. 24-12441 (LSS) |
| Debtors. | ) | |
| EXACTECH, INC. AND THE AD HOC GROUP OF PREPETITION FIRST LIEN LENDERS, | ) | Chapter 11 |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No. 24-_____ |
| JOINTMEDICA LIMITED AND JOINTMEDICA INVESTMENT HOLDINGS, L.P., | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Exactech Inc. ("**Exactech**") and the ad hoc group of Prepetition First Lien Lenders (the "**Ad Hoc Group**" and, together with Exactech, "**Plaintiffs**") bring this action to obtain a determination that Exactech's rights and interests in Defendant JointMedica Limited ("**JointMedica**") can be transferred, and related agreements between Exactech and JointMedica can be assumed and assigned, without the consent of entities affiliated with the Debtors' private equity sponsor. Plaintiffs allege, based on personal knowledge of their own conduct and otherwise on information and belief, as follows:

---

[1] The above-captioned debtors and debtors in possession in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250) (collectively, the "**Debtors**"). The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

## **NATURE OF THE ACTION**[2]

1.      This action seeks declaratory judgments that Defendants – entities majority owned and controlled by the Debtors' equity sponsor – cannot rely on anti-transfer restrictions in prepetition contracts to place assets beyond the reach of the Debtors' creditors.  Defendants contend that they have the contractual right to veto the Debtors' liquidation of key assets to pay creditor claims, even in chapter 11.  And they have signaled that they intend to exercise that veto, presumably so they can try to extract additional value for the Debtors' out-of-the-money equity sponsor.  Such a position is anathema to fundamental bankruptcy principles and cannot be sanctioned.  Under the Bankruptcy Code, the contractual anti-transfer provisions on which Defendants rely are overridden and unenforceable in chapter 11.  In any event, under applicable nonbankruptcy law and the circumstances of these cases, Defendants are not permitted to withhold their consent to the Debtors' planned use of assets.

2.      Plaintiff Exactech is a market-leading developer and manufacturer of medical devices.  Along with its other Debtor affiliates, Exactech filed these bankruptcy cases to effectuate a sale of substantially all its assets, as a going concern, through a chapter 11 plan.  The contemplated sale includes Exactech's equity interests in a separate medical devices company called JointMedica, as well as assumption and assignment of the operative shareholders agreement (the "**Amended Shareholders Agreement**") and its agreement to distribute JointMedica's product (the "**Amended Distribution Agreement**").  The sale and plan process are being pursued in accordance with a restructuring support agreement (the "**RSA**") that is supported by the Debtors' Prepetition First Lien Lenders.  The sale will maximize value for the Debtors' stakeholders and

---

[2] Capitalized terms used in this section but not otherwise defined shall have the meaning set forth elsewhere in this complaint.

afford the Debtors an opportunity to continue to service their customers and to maintain key business relationships with their partners and vendors.

3.        The Ad Hoc Group consists of holders of a majority of the Debtors' prepetition secured indebtedness.  Its members have also provided debtor-in-possession financing and are funding the Debtors' chapter 11 cases, including the marketing process for the Debtors' assets. The Final DIP Order provides that, as security for the financing, GLAS Trust Company LLC, as administrative and collateral agent under the DIP Credit Agreement, for the benefit of itself and the lender parties under the DIP Facility (collectively, the "**DIP Secured Parties**") have a superpriority lien on Exactech's shares in JointMedica "to the extent permitted under applicable bankruptcy law, applicable nonbankruptcy law, or the relevant contracts."  Final DIP Order ¶ 9(a), Case No. 24-12441, D.I. 319.  The Ad Hoc Group also is acting as the stalking horse bidder in the sale process for the Debtors' assets and intends to credit bid its claims under the DIP Facility.   The Final DIP Order provides that the DIP Agent shall have the right to credit bid for Exactech's shares of JointMedica "subject to any determination by [this] Court regarding the extent of the DIP liens" on the shares. *Id*. ¶ 28.  As a result, the viability of the Ad Hoc Group's credit bid for the JointMedica Shares – which forms an important component of the stalking-horse bid that will set the floor for the upcoming auction – depends on a conclusion from this Court concerning whether the shares are subject to the DIP Liens.

4.        Defendants have taken the position that the Debtors cannot grant a lien on or sell the JointMedica shares and cannot assign the Amended Distribution Agreement or Amended Shareholders Agreement, without their consent – which they have not given.  This position, if validated, would allow Defendants to hold valuable estate assets hostage and preclude their use in chapter 11 for the benefit of creditors.  Worse than this, the logical endpoint of Defendants'

position is that the Debtors' JointMedica shares and the Amended Distribution Agreement cannot be monetized to pay creditor claims at all and instead must be left behind in Exactech for the benefit *of the sponsor*.    This position contravenes the Bankruptcy Code and applicable nonbankruptcy law, as further described below.

5.    Without the relief sought in this adversary proceeding, Exactech cannot move forward with the sale, confirm a chapter 11 plan, and timely emerge from bankruptcy.  This dispute must be resolved promptly.  Plaintiffs now seek relief accordingly.

## THE PARTIES

6.    Exactech is a privately held Florida corporation with its principal place of business in Florida.

7.    The membership of the Ad Hoc Group, and the holdings of its members, is disclosed in the group's Verified Statement Pursuant to Bankruptcy Rule 2019, which may be amended or supplemented from time to time.  Rule 2019 Statement, Case No. 24-12441, D.I. 165. The Ad Hoc Group consists of lenders that are parties to a credit agreement dated February 14, 2018 ("**Prepetition First Lien Credit Agreement**" and the lenders under the Prepetition First Lien Credit Agreement, the "**Prepetition First Lien Lenders**"), under which they provided the Debtors with a $50,000,000 revolving credit facility, a $235,000,000 first lien term loan facility, and $6,500,000 of bridge loans.[3]  The members of the Ad Hoc Group have also provided the Debtors with $85 million of post-petition financing under the DIP Facility.  Under the RSA, one

---

[3] As amended by that certain Amendment No. 1 to Credit Agreement, dated as of December 17, 2019, that certain Amendment No. 2 to Credit Agreement, dated as of January 19, 2022, that certain Amendment No. 3 to Credit Agreement, dated as of March 3, 2023, and that certain Amendment No. 4 to Credit Agreement, dated as of October 9, 2024, and as further amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, among Exactech, Inc., as Borrower, Osteon Intermediate Holdings II, Inc., as Holdings and Guarantor, GLAS USA LLC, as successor Administrative Agent and Collateral Agent to Goldman Sachs Bank USA, Goldman Sachs Bank USA, as Issuing Bank and Swingline Lender, and the other Guarantors and Lenders from time to time party thereto.

or more entities to be formed by or on behalf of the Prepetition First Lien Lenders shall serve as the stalking horse purchaser ("**Stalking Horse Purchaser**") of the Debtors' assets and will credit bid for all collateral securing claims under the Prepetition First Lien Credit Agreement and the DIP Facility.  Each member of the Ad Hoc Group is a creditor of the Debtors and the estates and is directly affected by the outcome of this adversary proceeding, given its interest in the DIP Facility, the stalking horse bid, and the outcome of the contemplated sale process.

8.    JointMedica is a private company limited by shares, organized under the laws of the United Kingdom; it operates as an orthopedic device designer and manufacturer.

9.    JointMedica Investment Holdings, L.P. (f/k/a Osteon Investment Holdings, L.P) ("**JM Holdings**" and, together with JointMedica, "**Defendants**") is a limited partnership organized under the laws of the state of Delaware.

## JURISDICTION AND VENUE

10.    This is an action pursuant to Federal Rule of Bankruptcy Procedure 7001 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

11.    The Court has subject matter jurisdiction under 28 U.S.C. § 1334.

12.    This is a core proceeding under 28 U.S.C. § 157.  Under Bankruptcy Rule 7008, Plaintiffs consent to the entry of final orders or final judgment by this Court in this adversary proceeding.

13.    The Court has personal jurisdiction over Defendants, who appeared in the chapter 11 cases without reservation and sought affirmative relief from the Court, including in respect of disputes concerning the contractual anti-transfer provisions at issue in this adversary proceeding. Further, Defendants objected to entry of the Interim Order, but that objection was resolved by agreement with Defendants that provided that the Ad Hoc Group's right to credit bid for the JointMedica Shares would be "subject to any determination by [this] Court regarding the extent of

5

the" liens securing the DIP Facility (such liens, the "**DIP Liens**") on the shares; Defendants expressly agreed that this Court would resolve disputes concerning the contractual anti-transfer provisions at issue.[4]  The Court also has personal jurisdiction over Defendants because they have maintained minimum contacts with the United States in connection with the claims asserted in this action by, among other things, transacting business in the United States, which gives rise and relates to the claims at issue in this complaint.

14.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

15.     Exactech is a Debtor in the above-captioned chapter 11 cases.  It is a leading manufacturer and developer of orthopedic implant devices, related surgical instruments, and an AI-based platform of smart technologies for hospitals and physicians.

16.     Exactech's product portfolio spans three different categories: (a) extremities (shoulder and ankle), (b) large joints (knee and hip), and (c) others (ExactechGPS and other supporting materials).

I.     **Exactech Acquires an Interest in JointMedica in 2021.**

17.     In 2021, Exactech was provided an opportunity to make a minority investment in JointMedica, which at the time was fully owned by its founder, Andrew McMinn.  The investment opportunity was to include, among other things, Exactech's acquisition of a percentage of JointMedica's common stock, an economically favorable exclusive distribution agreement of certain JointMedica products, and governance rights in JointMedica.

---

[4] At the hearing on October 30, 2024, Defendants' counsel signaled that these issues, teed up in connection with the Debtors' motion for DIP financing, would be resolved in later proceedings before this Court. Oct. 30, 2024 Tr. at 34:1-35:1, Case No. 24-12441, D.I. 103.  The October 30, 2024 Transcript is attached as Exhibit D.

18.     On December 22, 2021, Exactech finalized its minority investment in JointMedica. To effectuate that transaction, Exactech and JointMedica entered into a series of agreements, including: (a) a *Subscription and Shareholders' Agreement* (the "**2021 Shareholders Agreement**"); (b) an *Exclusive Distribution Agreement* (the "**2021 Distribution Agreement**"); and (c) a *Distribution Quality Agreement*.  JointMedica adopted its articles of association the same day (the "**Articles**").

19.     Under the 2021 Shareholders Agreement, Exactech acquired approximately 2,400 shares in JointMedica, which represented 19.5% of JointMedica's common stock.  Upon execution of the 2021 Shareholders Agreement, the sole shareholders of JointMedica were Exactech and JointMedica's founder, Andrew McMinn.

20.     Under the 2021 Distribution Agreement, Exactech was granted the exclusive global right to distribute JointMedica's PolyMotion Hip implants, hip systems, and hip resurfacing instrumentation, in exchange for a royalty fee on all sales of the products payable on a quarterly basis.  The 2021 Distribution Agreement further required JointMedica to obtain the requisite regulatory approval to bring any hip resurfacing products to the U.S. market.

21.     The exclusive right to distribute JointMedica's PolyMotion Hip products provided an opportunity for Exactech to bolster its large joints product portfolio.  In entering into the 2021 Shareholders Agreement and 2021 Distribution Agreement, it was Exactech's expectation that its investment in JointMedica and exclusive distribution rights would yield substantial benefits.

II.     **The Sponsor, Through JM Holdings, Acquires a Controlling Interest in JointMedica in 2023.**

22.     Following Exactech's investment, JointMedica received a breakthrough device designation from the U.S. Food and Drug Administration (the "**FDA**") on its PolyMotion hip

resurfacing product and the FDA subsequently recommended that JointMedica complete a trial to bring the product to market in the United States.

23.     In or around April 2023, the Debtors' equity sponsor proposed a transaction by which it would make an investment in JointMedica through a newly-created investment vehicle—JM Holdings—in exchange for a majority of McMinn's interest in JointMedica (the "**JointMedica Transaction**").

24.     Around the time that the JointMedica Transaction was being negotiated, Exactech was facing significant mass-tort liability in connection with product recalls across federal, state, and non-U.S. jurisdictions.  The Debtors' sponsor was a named defendant in litigation concerning Exactech's products.

25.     On August 24, 2023, the JointMedica Transaction was consummated, and JM Holdings became the majority equity holder in JointMedica, owning 10,499 shares.[5]  As a result, Exactech's stake was diluted to an approximately 9.4% interest in JointMedica.  The shares in JointMedica that Exactech currently owns are referred to herein as the "**JointMedica Shares**."  In connection with this transaction, the parties amended JointMedica's Articles, the 2021 Distribution Agreement, and the 2021 Shareholders Agreement.  A copy of the "**Amended Articles**" is attached hereto as Exhibit A, and a copy of the "**Amended Shareholders Agreement**" is attached hereto as Exhibit B, and a copy of the "**Amended Distribution Agreement**" is attached hereto as Exhibit C.

26.     The Amended Articles and Amended Shareholders Agreement purport to give JM Holdings a consent right over any transfer by Exactech of the JointMedica Shares.  Specifically, the Amended Articles provide that "shares may only be Transferred . . . if the Transfer is made in

---

[5] Exactech and Mr. McMinn hold 2,422 and 1,293 shares, respectively.

accordance with the provisions of . . . any agreement between the shareholders." Ex. A, § 11. The Amended Shareholders Agreement purports to prohibit Exactech from transferring the JointMedica Shares unless, among other things, (a) JM Holdings consents to the transfer or (b) the transfer is made to a wholly owned subsidiary of Exactech. Ex. B, § 3.2.1(c).

27. The Amended Distribution Agreement likewise purports to give JointMedica a consent right over Exactech's assignment of the contract. It provides that Exactech cannot "assign, transfer, subcontract, mortgage, charge, declare a trust over, or deal in any other manner with any of its rights and obligations under [the Amended Distribution Agreement] without the prior written consent of [JointMedica]." Ex. C, § 24.1. Section 24.1 of the Amended Distribution Agreement goes on to provide, however, that "a Change of Control of a Party will not require the written consent of the other Party, except where such Change of Control would result in the control of the Distributor by a business engaged in the manufacture of orthopedic products which compete or could potentially compete with the Products." *Id.* A Change of Control is defined by section 1.1 to include "the sale or other transfer to a Third Party of all or substantially all of such entity's business to which the subject matter of this Agreement relates."

28. The Amended Shareholders Agreement and Amended Distribution Agreement are governed by the laws of England and Wales. Ex. B, §13.1; Ex. C, § 37.

### III. The Debtors File for Chapter 11 Protection and Defendants Oppose Exactech's Efforts to Sell Its Interests in JointMedica.

29. Several events led to the Debtors' filing these chapter 11 cases.

30. The Debtors and their non-debtor affiliates (collectively, the "**Company**") were faced with an increased number of complaints arising from the voluntary recall of certain Company products, which were consolidated into a multidistrict litigation before the United States District Court for the Eastern District of New York (the "**MDL**"). As of the Petition Date, there were

approximately 1,840 lawsuits pending in the MDL.  In addition, the Company was faced with a *qui tam* lawsuit asserting False Claims Act violations.  The Debtors' sponsor was a named defendant in several of these actions.

31.     By July 2024, the Company was facing increasing strain on its liquidity and imminent maturities in November 2024 and February 2025 for certain loan commitments under the Prepetition First Lien Credit Agreement.

32.     The Company and its advisors engaged in good-faith negotiations with the Company's stakeholders, including the Ad Hoc Group, and ultimately determined that the most appropriate path to maximize value of the Company's stakeholders was to seek chapter 11 protection.

33.     On October 29, 2024 (the "**Petition Date**"), the Company entered into the RSA with the members of the Ad Hoc Group and filed these chapter 11 cases shortly thereafter.

34.     The RSA contains the terms of a comprehensive restructuring and a framework for the Debtors' proposed sale of all or substantially all the assets of the estates.  Specifically, the Debtors are pursuing a sale under sections 363, 1123, and 1129 of the Bankruptcy Code, which shall be consummated through a joint chapter 11 plan.  The RSA also sets forth the Ad Hoc Group's commitment to serve as the Stalking Horse Purchaser, along with their commitment to fund administrative expenses and a chapter 11 process.

35.     In accordance with the RSA, the Debtors executed an asset purchase agreement (the "**Stalking Horse APA**") on October 29, 2024, with the Ad Hoc Group.  Stalking Horse APA, Case No. 24-12441, D.I. 145-2.

36.    Under the Stalking Horse APA, the Ad Hoc Group has agreed to serve as the Stalking Horse Purchaser for the proposed sale and will form an entity to purchase the Debtors' assets ("**NewCo**").  NewCo is not an affiliate of Exactech.

37.    The Stalking Horse APA also requires the Debtors to transfer the JointMedica Shares and assume and assign the Amended Distribution Agreement. Stalking Horse APA, § 3.

38.    To fund these cases and the proposed sale process, the Debtors obtained $85 million in debtor-in-possession financing (the "**DIP Financing**" and the facility providing such financing, the "**DIP Facility**") governed by a Debtor in Possession Credit Agreement (the "**DIP Credit Agreement**"), which is attached as Exhibit 1 to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claim, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Interim Order**") Case No. 24-12441 (Bankr. D. Del. 2024) D.I. 100-1.  The members of the Ad Hoc Group are serving as the lenders under the DIP Facility (in such capacity, the "**DIP Lenders**") and providing the funding under that DIP Credit Agreement.

39.    On October 29, 2024, the Debtors sought interim approval of the proposed DIP Financing.

40.    On October 30, 2024, Defendants filed a Notice of Appearance and Request for Service of Notices and Papers. Notice of Appearance, Case No. 24-12441, D.I. 43.  In that filing, law firms representing both Defendants stated that they "hereby enter their appearances . . . in the above captioned cases" and requested that "copies of any all notices and papers filed or entered in

these cases be given and served upon" them, as well as "all orders and notices of any application, motion, petition, pleading, request, complaint, or demand."

41.     Also on October 30, 2024, Defendants filed an objection to the proposed DIP Financing, asserting that Exactech's shares in JointMedica could not be encumbered by a lien without their consent.   Limited Objection, Case No. 24-1244, D.I. 34.   At the hearing on the proposed DIP Financing, counsel for Defendants appeared in open court (again, without reservation) to press the objection.   Counsel referenced not only purported limitations on liens being granted under section 364 of the Bankruptcy Code, but also restrictions on transferability of the JointMedica Shares under section 363 and restrictions on assumption and assignment of contracts under section 365. Counsel made clear that "[w]e've known of the intention to transfer [the JointMedica Shares] and we've been clear that we do not think they can transfer without our consent."   Likewise, he said, "to assign the contract . . . we think they're ultimately going to run headlong into . . . 365(c) . . . but we all know there's an exception for personal services contracts and contracts like this, which are joint venture."   Counsel then assured the Court that "[w]e'll get to that at another day."   Ex. D, at 34:14.

42.     The DIP Financing was approved on an interim basis after a contested hearing on October 31, 2024, following an agreement with Defendants.   The Interim Order granted GLAS Trust Company LLC, as administrative and collateral agent under the DIP Credit Agreement (the "**DIP Agent**"), for the benefit of itself and the lender parties under the DIP Credit Agreement, liens securing the DIP Financing under section 364(c)(2) of the Bankruptcy Code on the Debtors' interest in JointMedica Ltd. "to the extent permitted under applicable bankruptcy law, applicable non-bankruptcy law, or the relevant contracts."   Interim Order ¶ 7(a), Case No. 24-12441, D.I.

100.  This language, to which Defendants agreed, resolved their objection to entry of the order on an interim basis.

43.     Following entry of the Interim Order, and in anticipation of objections to approval of the DIP Financing on a final basis, the Ad Hoc Group and Defendants began a litigation concerning the applicability of the anti-transfer restrictions in bankruptcy, including reaching agreement about a litigation schedule and engaging in a dispute about discovery.  On November 6, 2024, counsel for Defendants wrote to the Court seeking a discovery conference.  On November 11, 2024, counsel for Defendants submitted a letter to the Court advancing their positions on the discovery dispute and seeking an order quashing the Ad Hoc Group's discovery requests relating to the anti-transfer provisions.  On November 13, 2024, counsel for Defendants appeared in this Court to argue their request to quash, and the Court granted the requested relief in part.  All of Defendants' appearances before and communications with the Court were made without reservation.

44.     The Ad Hoc Group and Defendants ultimately resolved their dispute over the anti-transfer provisions for purposes of the final DIP hearing by amending the proposed final order to provide, like the interim order, that the DIP Agent would have a lien on the JointMedica Shares "to the extent permitted under applicable bankruptcy law, applicable non-bankruptcy law, or the relevant contracts"; additionally, the Ad Hoc Group and Defendants agreed to modify the final order to provide that the agent shall have a right to credit bid for the JointMedica Shares "subject to any determination by the Court [defined to mean this Court] regarding the extent of the DIP Liens" on the shares.  Final Order ¶¶ 9(a), 28.  The Final DIP Order was entered on December 10, 2024.

45.     Against this backdrop, Plaintiffs bring this adversary proceeding to clarify their rights to pledge and sell Exactech's JointMedica Shares and assume and assign the Amended Distribution Agreement and Amended Shareholders Agreement.  It is essential that Plaintiffs bring this action now to ensure that the parties have full and fair opportunity to brief and present evidence on these issues, and that the Court has appropriate time to consider the issues in advance of the contemplated sale under the RSA and Stalking Horse APA.

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT THAT THE JOINTMEDICA SHARES MAY BE TRANSFERRED TO THE PURCHASER OF EXACTECH'S ASSETS WITHOUT DEFENDANTS' CONSENT**
**(28 U.S.C. §§ 2201, 2202 and 11 U.S.C. §§ 363, 1123, and 1129)**

46.     Plaintiffs repeat and re-allege all the foregoing paragraphs as if fully set forth herein.

47.     Plaintiffs seek a declaratory judgment that the JointMedica Shares may be transferred in these chapter 11 cases as part of the sale contemplated by the RSA, notwithstanding any purported contractual anti-transfer provisions under the Amended Shareholders Agreement and the Amended Articles.

48.     There is an actual controversy between the parties.  The Debtors are pursuing a sale of substantially all their assets, including the JointMedica Shares, through these chapter 11 cases. The members of the Ad Hoc Group are serving as the Stalking Horse Purchaser.  The stalking horse bid contemplates the sale of all the Debtors' assets, including the JointMedica Shares, to NewCo.  The Ad Hoc Group members intend to credit bid all their claims granted under the Final DIP Order and Prepetition First Lien Credit Agreement in the sale.  Under the DIP Financing, among other things, the DIP Secured Parties currently have a lien on Exactech's JointMedica Shares to the extent permitted by applicable law, and a right to credit bid that lien subject to a determination by this Court regarding the extent of the lien on the JointMedica Shares.  Defendants

have appeared in the cases and taken the position that the Debtors cannot pursue the sale of the JointMedica Shares without their consent under the Amended Articles or Amended Shareholders Agreement, which has not been given.  In order for the parties to move forward with the sale and confirm a plan, the dispute regarding Defendants' purported consent right must be resolved in advance of confirmation.

49.     The parties have an actual interest in the outcome of the dispute.  Exactech owns the JointMedica Shares, is party to the RSA, and is pursuing a sale of the JointMedica Shares.  The members of the Ad Hoc Group are party to the RSA and have formed NewCo to be the transferee of the Debtors' assets, including the JointMedica Shares.  The members of the Ad Hoc Group, through NewCo, are the stalking horse bidder for the JointMedica Shares and seek to credit bid for those shares.  Defendants have asserted consent rights over the sale of the JointMedica Shares, which Plaintiffs dispute.

50.     A resolution of these issues by the Court is necessary and appropriate at this time. The case timeline contemplates the consummation of the sale through a proposed chapter 11 plan by March 28, 2025, and the Debtors' prompt emergence from chapter 11 thereafter.  The Debtors have limited resources and cannot afford a prolonged stay in bankruptcy.  The Debtors will not be able to perform a complete sale without first resolving this legal dispute.

51.     A declaration from this Court is necessary for the Debtors to consummate the sale as contemplated under the RSA and Stalking Horse APA.

**I.      The Bankruptcy Code Permits a Transfer of All of the Debtors' Property, Including the JointMedica Shares, Under a Chapter 11 Plan Without Regard to Contractual Anti-Transfer Provisions.**

52.     The Bankruptcy Code permits a debtor to transfer "property of the estate" under a chapter 11 plan or through a motion, without regard to contractual anti-transfer provisions.

53.     The Debtors are pursuing a transfer of substantially all their assets, including the JointMedica Shares, as a going concern, through a chapter 11 plan.

54.     The JointMedica Shares constitute "property of the estate" under section 541 of the Bankruptcy Code that are capable of being transferred through a plan under sections 1123 and 1129 of the Bankruptcy Code, or through a motion under section 363 of the Bankruptcy Code.

55.     Section 1123(a)(5) provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . (B) transfer of all or any part of property of the estate to one or more entities . . . or (D) sale of all or any part of property of the estate."  The law of England and Wales, which is the law applicable to the contractual anti-transfer restrictions on which Defendants rely, is therefore overridden for purposes of a transfer or sale of estate property under a plan.

56.     Section 1123(b)(4) of the Bankruptcy Code provides that a chapter 11 plan may "provide for the sale of all or substantially all of the property of the estate," and does not express any limitation based on contractual transfer restrictions.

57.     Section 1129 of the Bankruptcy Code allows for confirmation of a plan upon satisfaction of its requirements, including that the plan "complies with applicable provisions of this title."  Each of sections 1123 and 1124 is an "applicable provision" of title 11, and mandates that background contract law is overridden for purposes of a transfer or sale of estate property under a plan.

58.     Section 363(b) provides that a debtor in possession may sell "property of the estate," and does not express any limitation based on contractual transfer restrictions.  It therefore overrides contractual anti-transfer provisions when a sale of estate property is proposed outside the context of a plan.

59.     Accordingly, the Bankruptcy Code authorizes the Debtors to sell the JointMedica Shares, without regard to the contractual anti-transfer provisions or applicable nonbankruptcy law.

**II.     The Contractual Anti-Transfer Provisions Purport to Deprive the Debtors of Essential Bankruptcy Rights and Are Therefore Unenforceable in Chapter 11.**

60.     In addition to express provisions of the Bankruptcy Code authorizing the sale notwithstanding applicable contract provisions or nonbankruptcy law, enforcing the contractual anti-transfer provisions under the Amended Articles and Amended Shareholders Agreement would deprive the Debtors of essential bankruptcy rights and are therefore unenforceable in chapter 11.

61.     The transfer restrictions in the Amended Shareholders Agreement and Amended Articles do not confer upon Defendants any property interest in the Debtors' JointMedica Shares, and Defendants do not otherwise have a property interest in the JointMedica Shares. The provisions establish only contractual rights, which are routinely adjusted in bankruptcy. Contractual provisions that purport to circumvent or interfere with the rights and protections afforded to debtors under the Bankruptcy Code are unenforceable.

62.     Sections 1123 and 363 of the Bankruptcy Code provide essential bankruptcy rights: mechanisms that allow for the sale of property of the estate to support a successful reorganization or otherwise realize value for the benefit of creditors.

63.     The anti-transfer provisions, if enforced, would deprive the Debtors of the essential bankruptcy right to monetize the JointMedica Shares and maximize the value of the estates for the benefit of creditors.  The Debtors would have no way to transfer the shares in chapter 11, which presumably means the shares would have to be left behind for the benefit of the sponsor.  This is a perversion of debtor-creditor relations and bankruptcy policy.  Thus, the contractual anti-transfer provisions are unenforceable in these chapter 11 cases.

**III.    Even if an Analysis of Applicable Non-Bankruptcy Law is Required, Defendants'
Contractual Anti-Transfer Provisions Do Not Prohibit the Sale of the JointMedica
Shares.**

64.    For the foregoing reasons, no analysis of English law[6] is required to grant the
declaration requested by this cause of action: the Bankruptcy Code alone is a sufficient basis to
enter judgment in Plaintiffs' favor.   Nonetheless, to the extent an analysis of applicable
nonbankruptcy law is required, the terms of the consent provisions in the Amended Articles and
Amended Shareholders Agreement do not prohibit the Debtors from selling the JointMedica
Shares to the successful purchaser, especially NewCo.

65.    English law implies a term into contracts (known as the *Braganza* duty) requiring
parties to exercise contractual discretion rationally and consistently with the purpose for which the
discretion was given, and not arbitrarily or capriciously.   In the present case, to the extent
Defendants have discretion to give or withhold consent to a transfer of the JointMedica Shares
under the Amended Articles and Amended Shareholders Agreement, then the *Braganza* duty is
implicated.

66.    Defendants' actions in withholding consent do not comport with the *Braganza* duty.
The purpose of the contractual discretion is to allow JM Holdings to consider the suitability of the
transferee by reference to the best interests of JointMedica and its shareholders – that is,
maximizing the value of JointMedica's business and its stock and advancing the interests of
shareholders *qua* shareholders.   Selling the shares in these chapter 11 cases to satisfy Exactech's
creditors will not inhibit that purpose.   This is especially so in the context of a sale to NewCo,
which will acquire Exactech's business as a going concern and operate it with the same
management and employees.   In this situation, there is *no* rational basis consistent with the purpose

---

[6] Pursuant to Fed. R. Civ. P. 44.1, made applicable by Fed. R. Bankr. P. 9017, Plaintiffs hereby provide notice that
the Court may need to determine issues related to the laws of England and Wales.

of the contractual discretion for Defendants to withhold their consent to a transfer.  Defendants

appear to be motivated by an attempt to gain an advantage in Exactech's bankruptcy, either for

themselves or the Debtors' sponsor.  That is not a permissible basis to withhold consent.

67.     In any event, a transfer ordered by the Court in a sale in accordance with the RSA

would not implicate the anti-transfer provisions.  The Amended Articles expressly contemplate

that shares may pass to another person in the event of a shareholder bankruptcy; and they do not

bar transmission of the shares when mandated by a *court* in the context of creditor enforcement.

**IV.     Separately and Alternatively, Section 363(f) of the Bankruptcy Code Permits a Sale
of All of the Debtors' Property, Including the JointMedica Shares, Without Regard
to Contractual Anti-Transfer Provisions.**

68.     The contractual anti-transfer provisions in the Amended Articles and Amended

Shareholders Agreement do not create a property interest in the JointMedica Shares, and

Defendants do not otherwise have an interest in those assets.  Alternatively, however, to the extent

Defendants do have an interest in property, Exactech may sell the JointMedica Shares free and

clear of such interest under section 363(f) of the Bankruptcy Code.

69.     Section 363(f)(1) authorizes free and clear sales if applicable nonbankruptcy law

permits such sales.  For the reasons above, applicable nonbankruptcy law permits the sale of assets

contemplated by the RSA.

70.     Section 363(f)(4) of the Bankruptcy Code authorizes the sale of property subject to

another entity's interest if that interest is subject to "bona fide dispute."  There are bona fide factual

and legal disputes regarding whether Defendants have any valid interest in the JointMedica Shares,

including for all the reasons described herein.

71.     Section 363(f)(5) authorizes sales free of claims or interests of another entity where

such entity could be compelled to accept money satisfaction.  Under English law, JM Holdings

has no automatic entitlement to injunctive relief, which is granted at the discretion of the Court.

Thus, it can be compelled to accept monetary satisfaction in lieu of enforcement of its asserted consent rights where it is just in all the circumstances or because JM Holdings has no legitimate interest extending beyond pecuniary compensation for the breach.

**SECOND CAUSE OF ACTION**
**DECLARATORY JUDGMENT THAT THE AMENDED DISTRIBUTION**
**AGREEMENT MAY BE ASSIGNED WITHOUT JOINTMEDICA'S CONSENT**
**(28 U.S.C. §§ 2201, 2202 and 11 U.S.C. §§ 365, 1123)**

72.     Plaintiffs repeat and re-allege all the foregoing paragraphs as if fully set forth herein.

73.     Plaintiffs seek a declaratory judgment that the Amended Distribution Agreement may be assumed and assigned in these chapter 11 cases as part of the sale contemplated by the RSA, without the consent of JointMedica.

74.     There is an actual controversy between the parties.  The Debtors are pursuing a sale of substantially all their assets, including Exactech's interest in JointMedica and the Amended Distribution Agreement, through these chapter 11 cases.  To effectuate that sale, the Debtors will assume and assign the Amended Distribution Agreement to the successful purchaser.

75.     The parties have an actual interest in the outcome of the dispute.  Exactech is a party to the Amended Distribution Agreement and intends to assign the contract to a successful bidder.  The members of the Ad Hoc Group are party to the RSA and the Stalking Horse Purchaser.  To the extent the Stalking Horse Purchaser is the successful bidder, section 1.1(h) of the Stalking Horse APA contemplates that NewCo will purchase "all of Exactech's rights and interests (including membership interests and other equity interests) in JointMedica Limited and any all agreements between the Sellers and JointMedica Limited, including that certain [Amended] Distribution Agreement."  Stalking Horse APA, § 1.1(h).  Defendants have asserted consent rights over the assignment of the Amended Distribution Agreement, which Plaintiffs dispute.

20

76.     A resolution of these issues by the Court is necessary and appropriate at this time. The case timeline contemplates the consummation of the sale of Exactech's interest in JointMedica through a proposed chapter 11 plan by March 28, 2025, and the Debtors' prompt emergence from chapter 11 thereafter.  The contemplated transaction cannot be effectuated without assumption and assignment of the Amended Distribution Agreement.  The Debtors have limited resources and cannot afford a prolonged stay in bankruptcy.  The parties need certainty regarding the viability of the proposed assumption and assignment without delay.

77.     A declaration from this Court is necessary for the Debtors to assume and assign the Amended Distribution Agreement.

## I.      The Amended Distribution Agreement is an Executory Contract.

78.     Section 365(a) of the Bankruptcy Code authorizes the assumption and section 365(f) authorizes the assignment of executory contracts.  Section 1123(b) provides that a chapter 11 plan may, subject to section 365, provide for assumption and assignment of any executory contract.

79.     The Amended Distribution Agreement is an executory contract because it contains material, unperformed obligations on both sides that remain in effect throughout the Amended Distribution Agreement's 10-year term and nonperformance of each would constitute a material breach excusing performance by the non-breaching party.  Ex. C, § 18.1.  Therefore, the Amended Distribution Agreement is subject to assumption and assignment under section 365 and 1123 of the Bankruptcy Code.

## II.     The Amended Distribution Agreement's Anti-Assignment Provisions are Expressly Overridden by the Bankruptcy Code.

80.     Defendant JointMedica has asserted that section 24.1 of the Amended Distribution Agreement prohibits Exactech from assigning its rights to the Amended Distribution Agreement without JointMedica's consent.

81.     Section 365(f)(1) of the Bankruptcy Code provides that a debtor may assign an executory contract, "notwithstanding a provision in [that] contract . . . or in applicable law, that prohibits, restricts, or conditions the assignment of such contract."  Additionally, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract . . . that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract . . . or a right or obligation under such contract . . . on account of an assignment of such contract . . ., such contract . . . right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract."

82.     The Amended Distribution Agreement is assignable under section 365(f) regardless of whether the agreement contains an anti-assignment provision, and Defendants are not permitted to terminate the Amended Distribution Agreement because of the assignment.

## III.     Applicable Law Does Not Excuse JointMedica from Accepting Performance by NewCo because the Amended Distribution Agreement is Assignable to NewCo Under Its Express Terms, Regardless of Applicable Law.

83.     The only relevant exception to section 365(f)'s express override of the anti-assignment provisions in the Amended Distribution Agreement is section 365(c)(1) of the Bankruptcy Code, which prohibits assumption and assignment if applicable law "excuses a party . . . to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor" and "such party does not consent to assumption or assignment."

84.    Section 24.1 of the Amended Distribution Agreement provides that Exactech may not assign or transfer the agreement without JointMedica's consent; but the next sentence provides an exception: "Notwithstanding the foregoing, a Change of Control of a Party will not require the written consent of the other Party, except where such Change of Control would result in the control of the Distributor by a business engaged in the manufacture of orthopedic products which compete or could potentially compete with the Products." Ex. C, § 24.1.

85.    A "Change of Control" is defined to mean, among other things, "the sale or other transfer to a Third Party of all or substantially all of such entity's business to which the subject matter of this Agreement relates." *Id.* § 1.1.

86.    The transaction contemplated under the Stalking Horse APA constitutes a "Change of Control" because it involves the sale of all Exactech's assets, and it does not involve the acquisition of Exactech's business by a competitor of JointMedica. Accordingly, the Amended Distribution Agreement does not require JointMedica's consent to this assignment as part of a Change of Control transaction, and section 365(c)(1)'s exception to 365(f) does not apply. Alternatively, section 24.1 of the Amended Distribution Agreement constitutes JointMedica's advance consent to the assignment of the contract in the sale contemplated by the RSA, regardless of whether applicable law excuses JointMedica from accepting performance, either pursuant to the personal services doctrine or in accordance with U.S. or U.K. trademark law.[7]

87.    Further, section 18.4 of the Amended Distribution Agreement provides that "[e]xcept in the event of a Change of Control of the Distributor to a Qualified Acquiror, the

---

[7] The Amended Distribution Agreement contains a license grant from JointMedica to Exactech, granting Exactech the "non-exclusive right, in the applicable portion of the Territory, to use the Supplier Trademarks in the promotion, advertisement, and sale of the Products in the relevant country from the date of grant of the relevant Regulatory Approval, subject to, and for the duration of, this Agreement or until such time as any such Regulatory Approval is withdrawn (whichever is the sooner)." Amended Distribution Agreement, section 14.2.

Supplier may terminate this Agreement following any Change of Control of the Distributor by giving nine months' notice in writing to the Distributor within the nine-month period following such Change of Control."  Ex. C, § 18.4.  "Qualified Acquiror" is defined to mean "any of the Third Parties listed on Schedule, which Schedule will be updated from time to time by the Parties in good faith to include other Third Parties with comparable distribution capabilities to the Third Parties then-listed on Schedule 5."  *Id*. § 1.1.

88.    Any attempt by JointMedica to terminate the Amended Distribution Agreement based on section 18.4 (or any other provision purporting to grant a termination right as a consequence of the assignment of the contract) would be barred by section 365(f) of the Bankruptcy Code.  Regardless, and in the alternative, section 18.4 imposes a duty on JointMedica to act in good faith to update the list of Qualified Acquirers.

89.    Any purchaser of Exactech's business to which the Amended Distribution Agreement may be assigned, especially NewCo, will have "comparable distribution capabilities," as it will be acquiring and carrying on Exactech's business with the same employees and management and therefore should be considered a "Qualified Acquiror."  Refusing to update the list of Qualified Acquirors to include the purchaser of Exactech's business would be inconsistent with JointMedica's obligations under the Amended Distribution Agreement.  In this situation, Defendants have *no* good-faith basis to withhold their consent to an assignment.  Defendants appear to be motivated by an attempt to gain an advantage in Exactech's bankruptcy, either for themselves or the Debtors' sponsor.  That is not a permissible basis to withhold consent.

90.    Thus, JointMedica's withholding of consent violates the requirement of the Amended Distribution Agreement for the parties to amend the definition of "Qualified Acquiror" in good faith.

91.     In any event, an assignment ordered by the Court in a sale in accordance with the RSA would not implicate the anti-assignment provision of the Amended Distribution Agreement. The contract does not bar assignment when mandated by a *court* in the context of creditor enforcement.

## IV.    The Amended Distribution Agreement Is Not a Personal Services Contract.

92.     Under English law, the Amended Distribution Agreement is not akin to a personal services or other similar type of contract that excuses the counterparty from accepting performance from an assignee.   Rather, the Amended Distribution Agreement expressly contemplates assignment to other distributors listed in its Exhibit 5 and updating the list to include other distributors with similar distribution capabilities.  Ex. C, at Exhibit 5.  Section 24.2 of the Amended Distribution Agreement also expressly permits Exactech to appoint sub-distributors, which requires only "consultation" rights for JointMedica, and not approval or consent rights.

93.     Moreover, the Amended Distribution Agreement is between corporate entities, not individuals.  It does not identify any specific individuals who are required to render performance or who are deemed essential to the carrying out of Exactech's obligations.

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT THAT THE AMENDED SHAREHOLDERS**
**AGREEMENT MAY BE ASSIGNED WITHOUT JOINTMEDICA'S CONSENT**
**(28 U.S.C. §§ 2201, 2202 and 11 U.S.C. §§ 365 and 1123)**

94.     Plaintiffs repeat and re-allege all the foregoing paragraphs as if fully set forth herein.

95.     Plaintiffs seek a declaratory judgment that the Amended Shareholders Agreement may be assumed and assigned in these chapter 11 cases as part of the sale contemplated by the RSA, without the consent of JointMedica.

96.     There is an actual controversy between the parties.  The Debtors are pursuing a sale of substantially all their assets, including Exactech's interest in JointMedica and transferring the Amended Shareholders Agreement, through these chapter 11 cases.  To effectuate that sale, the Debtors will assume and assign the Amended Shareholders Agreement to the successful purchaser.

97.     The parties have an actual interest in the outcome of the dispute.  Exactech is a party to the Amended Shareholders Agreement and intends to transfer its rights and obligations therein to the successful bidder.  The members of the Ad Hoc Group are party to the RSA and the Stalking Horse Purchaser.  To the extent the Stalking Horse Purchaser is the successful bidder, section 1.1(h) of the Stalking Horse APA contemplates that NewCo will purchase "all of Exactech's rights and interests (including membership interests and other equity interests) in JointMedica Limited and any all agreements between the Sellers and JointMedica Limited."  Stalking Horse APA, § 1.1(h).  Defendants have asserted consent rights over the assignment of the Amended Shareholders Agreement, which Plaintiffs dispute.

98.     A resolution of these issues by the Court is necessary and appropriate at this time.  The case timeline contemplates the consummation of the sale of Exactech's interests in JointMedica through a proposed chapter 11 plan by March 28, 2025, and the Debtors' prompt emergence from chapter 11 thereafter.  The contemplated transaction cannot be effectuated without assumption and assignment of the Amended Shareholders Agreement.  The Debtors have limited resources and cannot afford a prolonged stay in bankruptcy.  The parties need certainty regarding the viability of the proposed assumption and assignment without delay.

99.     A declaration from this Court is necessary for the Debtors to assume and assign the Amended Shareholders Agreement.

## I.      The Amended Shareholders Agreement is an Executory Contract.

100.     Section 365(a) of the Bankruptcy Code authorizes the assumption and section 365(f) authorizes the assignment of executory contracts.  Section 1123(b) provides that a chapter 11 plan may, subject to section 365, provide for assumption and assignment of any executory contract.

101.     The Amended Shareholders Agreement is an executory contract because it contains material, unperformed obligations on both sides that remain in effect throughout the Amended Shareholders Agreement's term.  Therefore, the Amended Shareholders Agreement is subject to assumption and assignment under section 365 and 1123 of the Bankruptcy Code.

## II.     The Amended Shareholders Agreement's Anti-Assignment Provisions are Expressly Overridden by the Bankruptcy Code.

102.     Defendant JointMedica has asserted that the Amended Shareholders Agreement prohibits Exactech from assigning its rights to the Amended Shareholders Agreement without JointMedica's consent.

103.     Section 365(f) of the Bankruptcy Code provides that a debtor may assign an executory contract, "notwithstanding a provision in [that] contract . . . or in applicable law, that prohibits, restricts, or conditions the assignment of such contract."  Additionally, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract . . . that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract . . . or a right or obligation under such contract . . . on account of an assignment of such contract . . . , such contract . . . right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract."

104.    The Amended Shareholders Agreement is assignable under section 365(f) regardless of whether the agreement contains an anti-assignment provision, and Defendants are not permitted to terminate the Amended Shareholders Agreement because of the assignment.

### III.    Applicable Law Does Not Excuse JointMedica from Accepting Performance by NewCo.

105.    The only relevant exception to section 365(f)'s express override of the anti-assignment provisions in the Amended Shareholders Agreement is section 365(c)(1) of the Bankruptcy Code, which prohibits assumption and assignment if applicable law "excuses a party . . . to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor" and "such party does not consent to assumption or assignment."

106.    Applicable law does not excuse JointMedica from accepting performance.  These anti-assignment provisions cannot themselves serve as the "applicable law" barring assignment under section 365(c)(1).

107.    Under English law, the Amended Shareholders Agreement is not akin to a personal services or other similar type of contract that excuses the counterparty from accepting performance from an assignee.

108.    The Amended Shareholders Agreement is between corporate entities, not individuals.  It does not identify any specific individuals who are required to render performance or who are deemed essential to the carrying out of Exactech's obligations.

### IV.    Alternatively, Any Acquirer of the JointMedica Shares Shall be Entitled to Join the Amended Shareholders Agreement Through a Deed of Adherence.

109.    In the alternative, no assignment of the Amended Shareholders Agreement is required for the acquirer of the JointMedica Shares to succeed to Exactech's rights and obligations under the contract.

110.    The recitals of the Amended Shareholders Agreement state that the parties thereto shall include not only the original signatories, but also "such other Persons who from time to time become party hereto by executing a Deed of Adherence and are designated by the Board as 'Other Investors,'" all of which are defined as "Shareholders."

111.    Section 3.1.4 of the Amended Shareholders Agreement provides that if shares of JointMedica are transferred, the transferee must deliver "an executed Deed of Adherence." Likewise, section 5.5 provides that JointMedica cannot issue shares unless the recipient delivers "an executed Deed of Adherence."

112.    The term "Deed of Adherence" is defined in the Amended Shareholders Agreement by reference to the form in Exhibit A of the contract.  Under the form Deed of Adherence, the recipient of JointMedica Shares "undertakes to be bound by the [Amended Shareholders Agreement] in all respects . . . as if [it] were an original party."  Ex. B, at Exhibit A.

113.    The parties to the Amended Shareholders Agreement thus expressly agreed that upon a transfer of the JointMedica Shares, the contract would not have to be assigned to the acquirer; instead, the acquirer could join and agree to be bound by the contract through the execution of a new Deed of Adherence.

114.    To the extent the Amended Shareholders Agreement cannot be assigned by Exactech in chapter 11, the acquirer of the JointMedica Shares nevertheless is permitted to succeed Exactech with respect to the contract by signing a Deed of Adherence.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT THAT A POST-PETITION LIEN CAN BE AND**
**HAS BEEN IMPOSED ON THE JOINTMEDICA SHARES WITHOUT**
**JOINTMEDICA'S CONSENT**
**(28 U.S.C. §§ 2201, 2202 and 11 U.S.C. §§ 364 and 544(a))**

115.    Plaintiffs repeats and realleges all the foregoing paragraphs as if fully set forth herein.

116.    Plaintiffs seek a declaratory judgment that a post-petition lien can be and has been placed on Exactech's shares of JointMedica in favor of the DIP Agent to secure the Debtors' obligations under the DIP Facility, without Defendants' consent.

117.    There is an actual controversy between the parties.  The Debtors are pursuing a sale of substantially all their assets, including the JointMedica Shares, through these chapter 11 cases. The members of the Ad Hoc Group are serving as the Stalking Horse Purchaser and DIP Lenders under the DIP Credit Agreement in these chapter 11 cases.  The Stalking Horse APA contemplates the sale of all the Debtors' assets, including the JointMedica Shares, to NewCo.  The members of the Ad Hoc Group intend to credit bid all their claims under the DIP Facility in the sale.  Under the DIP Financing, among other things, the DIP Secured Parties currently have a lien on Exactech's JointMedica Shares to the extent permitted by applicable law, and their right to credit bid is subject to a determination by this Court as to the extent of that lien.  Defendants have appeared in the cases and taken the position that no lien can be placed on the JointMedica Shares without their consent, which has not been given.  This calls into question whether the stalking horse credit bid for the JointMedica Shares, which serves as the baseline for the auction of the shares, is viable.  In order for the parties to move forward with the sale and confirm a plan, the dispute regarding Defendants' purported consent right must be resolved in advance of confirmation.

118.    The parties have an actual interest in the outcome of the dispute.  Exactech owns the JointMedica Shares, is party to the RSA, and is pursuing a sale of the JointMedica Shares.  The DIP Secured Parties have a lien on and right to credit bid for the JointMedica Shares to the extent this Court rules in their favor on this issue.  Defendants have asserted consent rights over the encumbrance of the JointMedica Shares, which the Ad Hoc Group disputes.

119.    A resolution of these issues by the Court is necessary and appropriate at this time. The case timeline contemplates the consummation of the sale through a proposed chapter 11 plan by March 28, 2025, and the Debtors' prompt emergence from chapter 11 thereafter.  The Debtors have limited resources and cannot afford a prolonged stay in bankruptcy.  The Debtors will not be able to perform a complete sale without first resolving this legal dispute.

120.    A declaration from this Court is necessary for all parties in interest to know the extent to which the JointMedica Shares are encumbered and the DIP Secured Parties are entitled to acquire them through a credit bid.

**I.      The Bankruptcy Code Permits the DIP Lien on the JointMedica Shares Without Regard to Contractual Anti-Transfer Provisions.**

121.    Section 364(c)(2) of the Bankruptcy Code provides that "[i]f the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) . . . the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt . . . secured by a lien on property of the estate that is not otherwise subject to a lien."

122.    The Debtors were unable to obtain unsecured credit to fund these chapter 11 cases.

123.    The JointMedica Shares constitute "property of the estate" under section 541 of the Bankruptcy Code.

124.    The JointMedica Shares are not subject to a lien other than the DIP Lien and are thus otherwise unencumbered.  Defendants do not have a property interest in the JointMedica Shares, by virtue of the contractual anti-transfer provisions on which they rely or otherwise.

125.    Section 364(c)(2) does not impose any other limitation or prerequisite to the imposition of a lien to secure post-petition credit, let alone any limitation based on contractual anti-transfer provisions.

126.    All statutory requirements under section 364(c) have been met, and therefore the JointMedica Shares can be encumbered by a lien as set forth in the Final DIP Order.

## II.    The Contractual Anti-Transfer Provisions Purport to Deprive the Debtors of Essential Bankruptcy Rights and Are Therefore Unenforceable in Chapter 11.

127.    Enforcing the contractual anti-transfer provisions under the Amended Articles and Amended Shareholders Agreement would deprive the Debtors of essential bankruptcy rights and are therefore unenforceable in chapter 11.

128.    The transfer restrictions in the Amended Shareholders Agreement and Amended Articles do not confer upon Defendants any property interest in the Debtors' JointMedica Shares and Defendants do not otherwise have a property interest in the JointMedica Shares. The provisions establish only contractual rights, which are routinely adjusted in bankruptcy. Contractual provisions that purport to circumvent or interfere with the rights and protections afforded to debtors under the Bankruptcy Code are unenforceable.

129.    Section 364 of the Bankruptcy Code provides an essential bankruptcy right: the ability to attract post-petition credit that is needed to finance a chapter 11 case by making otherwise unencumbered property available to secure new loans.

130.    Because the transfer restrictions in the Amended Shareholders Agreement and Amended Articles purport to interfere with this essential right of the bankruptcy estates, they are unenforceable.

**III.    Even if an Analysis of Applicable Non-Bankruptcy Law is Required, Defendants' Contractual Anti-Transfer Provisions Do Not Prohibit the DIP Lien on the JointMedica Shares.**

131.    For the foregoing reasons, no analysis of English law is required to grant the declaration requested by this cause of action: the Bankruptcy Code alone is a sufficient basis to enter judgment in Plaintiffs' favor.    Nonetheless, to the extent an analysis of applicable nonbankruptcy law is required, the terms of the consent provisions in the Amended Articles and Amended Shareholders Agreement do not prohibit the DIP Lien on the JointMedica Shares.

132.    Under English law, contracts contain an implied term (known as the *Braganza* duty) requiring parties to exercise contractual discretion rationally and consistently with the contractual purpose of the discretion.    To the extent Defendants have discretion to give or withhold consent to the pledge of the JointMedica Shares under the Amended Articles and Amended Shareholders Agreement, then the *Braganza* duty is implicated.

133.    Defendants' actions in withholding consent do not comport with the *Braganza* duty. The purpose of the contractual discretion is to allow JM Holdings to consider the suitability of the transferee by reference to the best interests of JointMedica and its shareholders, i.e. maximizing the value of JointMedica's business and its stock and advancing the interests of shareholders *qua* shareholders.    The DIP Lien does not inhibit that purpose. To the contrary, the DIP Lien does not have any effect on Defendants; whether the DIP Lien is granted affects only whether there can be a credit bid for the JointMedica Shares by the stalking horse bidder. Defendants should be indifferent to whether the stalking horse bidder can pay for the assets with a credit bid or some other form of consideration.    In this situation, there is *no* rational basis consistent with the purpose

of the contractual discretion for Defendants to withhold their consent to a lien.  Defendants appear

to be motivated by an attempt to gain an advantage in Exactech's bankruptcy, either for themselves

or the Debtors' sponsor.  That is not a permissible basis to withhold consent.

## IV.    Alternatively, the Estates May Transfer the Judicial Lien They Already Have Over the JointMedica Shares to the DIP Agent to Secure the DIP Facility.

134.    Under section 544(a) of the Bankruptcy Code, Exactech has "the rights and powers

of . . . a creditor that extends credit to the debtor at the time of the commencement of the case, and

that obtains, at such time and with respect to such credit, a judicial lien on all property on which a

creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor

exists."

135.    Under section 101(36) of the Bankruptcy Code, a judicial lien is a "lien obtained

by judgment, levy, sequestration, or other legal or equitable process or proceeding." Under section

101(37), a lien is a "charge against or interest in property to secure payment of a debt or

performance of an obligation." 11 U.S.C. § 101(37).

136.    Under English law, a creditor on a simple contract could obtain a judgment against

Exactech and apply to a court for a "charging order" on the JointMedica Shares, regardless of the

transfer restrictions in the Amended Shareholders Agreement and Amended Articles.  The grant

of such a charging order would not run afoul of the anti-transfer provisions, including because it

would not result a pledge by Exactech, but rather in a lien ordered by a court.

137.    English law also permits a judgment creditor with a charging order to transfer that

charging order to another person.

138.    Exactech therefore already has a judicial lien on the JointMedica Shares and can

transfer it to the DIP Agent as security for new extensions of credit under the DIP Facility, without

the consent of Defendants.

## **PRAYER FOR RELIEF**

139.    WHEREFORE, Plaintiffs seek judgment against Defendants in this adversary proceeding, and request relief from this Court as follows:

    A.  entry of a declaratory judgment that Exactech can transfer, convey, transmit, sell or otherwise dispose of the JointMedica Shares without Defendants' consent;

    B.  entry of a declaratory judgment that Exactech may assume and assign the Amended Distribution Agreement without Defendants' consent;

    C.  entry of a declaratory judgment that Exactech may assume and assign the Amended Shareholders Agreement without Defendants' consent or, alternatively, that the acquirer of the JointMedica Shares may succeed to Exactech by executing a Deed of Adherence;

    D.  entry of a declaratory judgment that the JointMedica Shares can be and have been encumbered by a lien securing the DIP Facility, and that the DIP Agent is permitted to credit bid for the JointMedica Shares; and

    E.  all such other relief as the Court may find just and proper.

[Signature pages follow]

Dated: December 13, 2024
          Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kevin A. Guerke*
Kevin A. Guerke (No. 4096)
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  kguerke@ycst.com
          rbartley@ycst.com
          ejustison@ycst.com

*Co-Counsel to Exactech, Inc.*

-and-

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Erin Rosenberg (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email:  gregory.pesce@whitecase.com
          erin.rosenberg@whitecase.com
          laura.baccash@whitecase.com

*Independent Counsel and Co-Counsel to Exactech, Inc.*

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Zachary I. Shapiro*
Mark D. Collins (No. 2981)
Zachary I. Shapiro (No. 5103)
David T. Queroli (No. 6318)
Zachary J. Javorsky (No. 7069)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: collins@rlf.com
        shapiro@rlf.com
        queroli@rlf.com
        javorsky@rlf.com

-and-

**MILBANK LLP**
Evan R. Fleck, Esq. (admitted *pro hac vice*)
Nelly Almeida, Esq. (admitted *pro hac vice*)
Alexander B. Lees, Esq. (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Email: efleck@milbank.com
        nalmeida@milbank.com
        alees@milbank.com

*Counsel for the Ad Hoc Group*